# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-3140
_____

United States of America,

*Plaintiff - Appellee,*

v.

Bartolomea Joseph Montanari,

*Defendant - Appellant.*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: October 21, 2016
Filed: July 12, 2016

_____

Before LOKEN, SMITH,[1] and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

In 2014, a jury convicted Bartolomea Montanari of tax evasion, mail fraud, and wire fraud for conduct relating to the operation of three companies that he owned in Minnesota and Kentucky. The district court sentenced him to 78 months'

_____

[1]The Honorable Lavenski R. Smith became Chief Judge of the United States Court of Appeals for the Eighth Circuit on March 11, 2017.

imprisonment, the bottom of the advisory guideline sentencing range. Montanari challenges the conviction based on the district court's limitation of his cross-examination of a witness, and he disputes the court's calculation of his advisory guideline range. We affirm the conviction and reject most of Montanari's challenges to the sentence, but we vacate the judgment and remand for resentencing based on one guideline computation error acknowledged by the government.

I.

Montanari owned a real estate business in Minnesota called St. Croix Development, LLC and two businesses in Kentucky related to coal mining, Emlyn Coal Processing, LLC and Montie's Resources, LLC. From around 2004 to 2006, Montanari failed to pay payroll taxes due from St. Croix Development and also failed to file several of the company's quarterly payroll tax returns.

In December 2008, Minnesota-based IRS revenue officer Dale Mikel was assigned to Montanari's case to collect St. Croix Development's delinquent taxes. In fall 2009, Mikel sent Montanari IRS Form 433-A to obtain financial information about him for purposes of collection. Montanari returned his completed Form 433-A, signed under penalty of perjury, in December 2009.

In the Form 433-A, Montanari stated that he had "no income currently." He listed St. Croix Development as an "employer," but did not mention Emlyn Coal or Montie's, although he drew a monthly salary of up to $50,000 from them. Montanari falsely represented that he had no bank accounts, credit cards, or business assets. He also failed to list multiple luxury vehicles that he owned or a Tennessee home worth over $1.4 million in which he had been living since September 2009.

Mikel ultimately determined that Montanari was liable for the unpaid St. Croix Development payroll taxes under a trust fund recovery penalty. This penalty is

assessed against a person who is responsible for paying withheld employment taxes and willfully fails to pay them.  26 U.S.C. § 6672.

At around the same time, Emlyn Coal and Montie's developed tax problems in Kentucky.  Minnesota businessman David Kloeber had co-owned Emlyn Coal with Montanari from 2007 to 2009.  Until Montanari bought out Kloeber's interest in 2009, Kloeber and his employees had managed the taxes of Emlyn Coal and Montie's.  After Kloeber's departure in 2009, the companies fell behind in their obligations to pay employment taxes and coal excise taxes.  Montanari received numerous notices from the IRS about the outstanding taxes.

Kentucky-based IRS revenue officer Evelyn McDaniel began investigating Emlyn Coal and Montie's in 2010.  In an interview with McDaniel, Montanari said that he was unaware that the companies were failing to pay taxes or to file tax returns. He also stated that the companies were not receiving any revenue.  McDaniel ultimately determined that Montanari was liable for unpaid payroll and excise taxes from Emlyn Coal and Montie's under a trust fund recovery penalty.

In June 2011, Montanari filed a second Form 433-A under penalty of perjury and failed to report bank accounts, credit cards, personal property, and real property. He also did not explain that he transferred funds from Emyln Coal and Montie's to himself for personal expenses.  From 2009 until 2012, Montanari withdrew over $1.7 million from Emlyn Coal and Montie's; some of the funds were transferred to a bank account in the name of a shell company called Bella Luca Properties LLC. Montanari spent much of this money on a new home, vacations, and vehicles.

Around April 2012, Kloeber contacted IRS Special Agent James Shoup regarding Montanari's conduct.  Kloeber was acquainted with Shoup through a prior unrelated tax investigation.  Shoup began a criminal investigation of Montanari. During a telephone call with Montanari in September 2012, Shoup asked several

questions about why Montanari did not use any of the money that he was taking from the companies to pay their employment taxes. Montanari answered that he did not know why. Shoup also inquired about a purchase of a bulldozer by Montie's in 2009. In that transaction, Montanari was suspected of obtaining a kickback of $100,000 by altering an invoice to increase the purchase price and then securing financing for the surplus amount. Montanari denied culpability.

In May 2014, a grand jury charged Montanari with tax evasion for evading and defeating the payment of employment and excise taxes owed by him and the three businesses that he controlled. The indictment also charged mail fraud and wire fraud based on the allegedly fraudulent purchase of the bulldozer. A jury convicted Montanari on all counts.

At sentencing, the district court found that Montanari's total outstanding tax liabilities with respect to St. Croix Development, Emlyn Coal, and Montie's at the beginning of trial were $1,584,534.75, including penalties, interest, and credits. The court used this figure as the "tax loss" for the tax evasion offense under USSG §§ 2T1.1(a) and 2T4.1. The court also applied a two-level specific offense characteristic for failure to report income from criminal activity exceeding $10,000 in any year, *see* USSG § 2T1.1(b)(1), a two-level specific offense characteristic for use of sophisticated means, *see* USSG § 2T1.1(b)(2), and a two-level adjustment for obstruction of justice under USSG § 3C1.1. Based on the resulting offense level of 28 and criminal history category I, the court determined an advisory sentencing range of 78 to 97 months' imprisonment and sentenced Montanari at the bottom of the range.

II.

On appeal, Montanari argues that he is entitled to a new trial because the district court improperly limited his cross-examination of prosecution witness Kloeber. On direct examination, the government asked Kloeber about his role in the fraudulent

bulldozer transaction, his decision to contact Agent Shoup regarding Montanari's misconduct, and inaccurate testimony that he gave during a deposition in Montanari's personal bankruptcy proceeding. On cross-examination, the district court sustained objections to three questions on the ground that they were beyond the scope of direct examination. One question asked whether Kloeber's office had a part in handling the day-to-day accounting and bookkeeping for Emlyn Coal; a second asked whether one of Kloeber's employees was an officer at Emlyn Coal; and a third inquired whether one of Kloeber's officers was involved with Montie's.

Even assuming that Kloeber would have answered each of these questions in the affirmative, we see no abuse of discretion in the district court's ruling. The questions were beyond the scope of direct examination. Montanari observes correctly that questions beyond the scope may be proper if they address matters affecting the witness's credibility. *See* Fed. R. Evid. 611(b). But even so, trial judges retain wide latitude to impose reasonable limits on such cross examination. *United States v. Drapeau*, 414 F.3d 869, 875 (8th Cir. 2005). Montanari does not explain how the information sought in his three disputed questions would have revealed Kloeber's bias or otherwise enlightened the jury about Kloeber's credibility. And Montanari was able to elicit later in the cross-examination that Kloeber's chief financial officer was the vice president of Emlyn Coal, thus supplying the answer to at least one of the objected-to questions. Montanari has not demonstrated any error that warrants a new trial.

Montanari also raises several issues regarding his sentence. The first issue concerns the district court's finding of "tax loss." In a tax evasion case, the defendant's base offense level under the guidelines is based on the "tax loss." USSG § 2T1.1(a). "Tax loss" means "the total amount of loss that was the object of the offense (*i.e.*, the loss that would have resulted had the offense been successfully completed)." *Id*. § 2T1.1(c)(1). In a tax evasion case, this loss amount includes interest and penalties. *Id*. § 2T1.1, comment. (n.1). The guidelines direct that "all

conduct violating the tax laws should be considered as part of the same course of conduct . . . unless the evidence demonstrates that the conduct is clearly unrelated." *Id.* § 2T1.1, comment. (n.2). Where the court cannot determine a precise amount, "the guidelines contemplate that the court will simply make a reasonable estimate based on the available facts." *Id.* §2T1.1, comment. (n.1).

The district court found that the tax loss was $1,584,534.75. The government presented evidence that this figure represented the total amount of taxes owed by the three companies for which Montanari was responsible, plus penalties and interest, less any credits due to Montanari for payments made. The amount was determined as of the first day of trial in the case. The court thus applied a base offense level of 22 for tax loss of more than $1,000,000. *See* USSG § 2T4.1(I) (2014).[2]

Montanari argues that the district court should have counted only taxes that were "assessed" against him personally. He does not explain what he means by "assessed," but tax loss under the guidelines is not limited to amounts that are formally assessed through a civil or administrative process. Montanari was responsible for unpaid payroll and excise taxes due from the three companies that he owned. Although some of these amounts might not have been encompassed by the charged tax evasion offense, the court properly counted them under § 2T1.1 as amounts accrued as part of the same course of conduct with respect to the same entities. *See United States v. Thomas*, 635 F.3d 13, 17 (1st Cir. 2011); *United States v. Ervasti*, 201 F.3d 1029, 1042-43 (8th Cir. 2000). None of the conduct was "clearly unrelated" to the

---

[2]Effective November 2015, the Sentencing Commission amended § 2T4.1(I) to provide that a base offense level of 22 corresponds to a tax loss of more than $1,500,000. The district court properly applied the guideline in effect at the time of sentencing, USSG § 1B1.11(a), and the Commission did not apply the amendment retroactively. *Id.* § 1B1.10(d). In any event, based on the district court's finding of a tax loss greater than $1.5 million, Montanari's base offense level would be 22 under the amended guideline as well.

offense of conviction.  Montanari adverts to *United States v. Black*, 815 F.3d 1048 (7th Cir. 2016), which held that bad checks tendered to the IRS to satisfy tax liens could not increase a pre-existing tax loss, but there is nothing analogous here.  The district court did not clearly err in determining that Montanari's base offense level was 22 based on a tax loss of greater than $1,000,000.

Montanari next challenges the district court's finding that he obstructed justice within the meaning of USSG § 3C1.1.  A defendant obstructs justice under the guidelines by "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense."  USSG § 3C1.1, comment. (n.4(G)).  The court found obstruction based on Montanari's false statements during his telephone interview with IRS Special Agent Shoup and in "the Kentucky end of the case," which included his communications with IRS revenue officer McDaniel and the second Form 433-A that he submitted in June 2011.

Montanari argues that his false statements were too intertwined with the tax evasion offense to justify an adjustment under § 3C1.1.  A defendant's obstruction under the guideline must be distinct from the offense of conviction, because he must obstruct "the investigation, prosecution, or sentencing of the instant offense." § 3C1.1; *see United States v. Lamere*, 980 F.2d 506, 517 (8th Cir. 1992).  To convict Montanari of tax evasion, the jury was required to find that he willfully performed one of two affirmative acts alleged in the indictment.  Those acts were Montanari's filing of a false and fraudulent Form 433-A in December 2009 and his transfer of funds from his companies to the Bella Luca bank account.  The district court recognized that an obstruction adjustment could not be premised on these enumerated acts, and the court relied instead on Montanari's false statements to Shoup and McDaniel and his false Form 433-A filed in June 2011.  The district court's finding thus conformed to the guideline.

Montanari also contends that his statements to Agent Shoup during the telephone interview did not "significantly" obstruct the government's investigation or prosecution of his offense. This standard is met where "the investigation and prosecution reasonably would have proceeded more quickly and required less effort" if the defendant had made truthful statements to law enforcement. *United States v. McKanry*, 628 F.3d 1010, 1021 (8th Cir. 2011). The district court's finding that Montanari obstructed justice was not based on his statements to Shoup alone. The court also relied on Montanari's false statements to revenue officer McDaniel in Kentucky and on his false Form 433-A filed in June 2011. These false statements significantly obstructed the government's investigation or prosecution, and Montanari does not contend otherwise. If Montanari had not misled McDaniel by claiming ignorance of the nonpayment of taxes and by stating that his companies were in poor financial condition, the IRS would have known or strongly suspected that he was willfully avoiding the payment of taxes. A truthful Form 433-A also would have alerted the IRS to the Bella Luca account and raised suspicion about tax evasion. Montanari's false statement to Shoup also hindered the government's investigation by implying that there was no conscious avoidance of taxes and discouraging further scrutiny. Taking all of Montanari's false statements together, the district court did not clearly err in concluding that he significantly obstructed the government's investigation or prosecution of his offense.

Montanari's third complaint about the obstruction adjustment is that the district court relied on false statements that were too remote from any potential criminal investigation. Montanari's false statements to Agent Shoup, however, came after the IRS opened a criminal investigation into Montanari's activities. Montanari's statements to revenue officer McDaniel in 2010 and his Form 433-A filed in June 2011 did precede the criminal investigation. But obstructive conduct that occurs prior to the start of an investigation may justify an adjustment if "the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." USSG § 3C1.1, comment. (n.1). There was a sufficient basis

for the court to conclude that Montanari's statements to McDaniel and his false Form 433-A met this standard, because they were designed to thwart an investigation into the unpaid taxes owed by Emlyn Coal and Montie's. The district court did not clearly err in applying the two-level adjustment for obstruction of justice.

Montanari next disputes the two-level specific offense characteristic under § 2T1.1(b)(1) for failing to report a source of income exceeding $10,000 from criminal activity. On appeal, the government acknowledges that it did not establish by sufficient evidence that Montanari failed to pay taxes on the $100,000 that he obtained through the fraudulent bulldozer transaction. We accept the government's concession and therefore conclude that the district court should resentence Montanari. The court should consider a recalculated advisory guideline range that does not rely on this specific offense characteristic, including any effect that it has on the "grouping" rules under USSG § 3D1.2(c).

\*       \*       \*

For the foregoing reasons, we affirm Montanari's conviction, vacate the sentence, and remand the case for resentencing.

_____